UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| DIXIE L. SMITH, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) Case No. 4:12-CV-2347 (CEJ) |
| CAROLYN W. COLVIN, Commissioner of Social Security,[1] | ) ) ) ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

### I. Procedural History

On November 13, 2009, plaintiff Dixie Smith filed an application for disabled widower's insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 402 *et. seq.*, (Tr. 119-125), with an onset date of February 1, 2008. (Tr. 120). After plaintiff's application was denied on initial consideration (Tr. 67-71), she requested a hearing before an Administrative Law Judge (ALJ). See Tr. 76-85 (acknowledging request for hearing).

Plaintiff and counsel appeared for a hearing on July 13, 2011. (Tr. 20-51). On August 25, 2011, the ALJ issued a decision denying plaintiff's application (Tr. 9-15), and the Appeals Council denied plaintiff's request for review on May 14, 2012. (Tr. 1-5). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013, and should be substituted for Michael J. Astrue as the defendant in this suit. No further action need to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

### A. Disability Application Documents

In her Disability Report (Tr. 157-165), plaintiff listed her disabling conditions as osteomyelitis and fibromyalgia. She stated that jaw bone infection limited her ability to work. Plaintiff reported that she completed one year of college and worked as a part-time officer manager at a hair salon from 1994 to July 1, 1999.

In her Function Report (Tr. 166-177), plaintiff stated that she lives alone in a house. Plaintiff wrote that she suffers from pain and weakness, which affects her ability to eat, concentrate, sleep, lift, squat, bend, stand, reach, walk, kneel, climb stairs, and use her hands. Plaintiff wrote that she is able to play video games, puzzles, and use a computer for one hour "on good days." Her other hobbies include making jewelry, when her hands have strength, and reading.

Plaintiff stated that she has a valid driver's license and is able to drive. Her daily activities include taking care of her cats, making tea, taking medication, cleaning the house, eating, showering, and resting twice a day. She wrote that on her "bad days" she requires help from her daughter and a housekeeper. Plaintiff reported that she can no longer cook regular meals, clean her house as much as she would like, and maintain her yard. The meals she prepares typically include sandwiches, frozen items, and cereal. She did not report any difficulties in maintaining her personal care and stated that she can carry laundry up and down the stairs. Plaintiff leaves her home 3 to 4 times per week and shops for food, clothing, and personal items when needed. She is also able to pay bills, handle a savings account, count change, and use a checkbook.

Plaintiff reported that she can walk half a block before needing to rest and depending on her pain she can concentrate for approximately 15 minutes at one time.

She wrote that stress increases her pain and lowers her ability to concentrate. She also reported that she can finish tasks, can follow written instructions most of the time, and gets along with most people.

### B. Hearing on July 13, 2011

At the time of the hearing, plaintiff was 58 years old, widowed, and lived alone. (Tr. 25-16). Plaintiff's height was 5'0" and she weighed 175 pounds. (Tr. 25). She had two adult daughters. (Tr. 26). Plaintiff completed one year of college and obtained an Illinois cosmetology license that had since expired. (Tr. 27-28). Plaintiff testified to owning a Buick SUV, but that because of her lower back and arm pain, she cannot drive for more than 15 minutes at one time. (Tr. 26-27). Plaintiff testified that in the last 15 years she has held one job as an office manager for a beauty salon. (Tr. 28-29). Her job duties included booking appointments, checking in clients, cleaning tanning beds, washing towels, stocking shelves, and hiring and firing employees. (Tr. 29-30, 46).

Plaintiff testified that she has no difficulties with her ability to read, but that because of the pain and discomfort of her fibromyalgia she cannot write for long periods of time. (Tr. 30-31). Plaintiff stated that she was diagnosed with osteomyelitis, resulting from a bone infection that cleared up in July or August of 2008. (Tr. 32-33, 44). She also suffers from and takes medicine for anxiety. (Tr. 32). Plaintiff testified that 15 to 20 days each month she suffers from so much pain in her shoulders, neck, arms, legs, feet, breasts, and head that the most she is able to do is feed her cat and

take medicine. (Tr. 33-34). She testified that she takes Gabapentin,[2] Skelaxin,[3] Vicodin,[4] and Savella,[5] but that she is always in pain. (Tr. 34-36). Plaintiff stated that her medications make her feel tired and that her pain ranges from sharp to a constant dull aching. (Tr. 35-36, 41). Plaintiff testified that the pain makes it difficult for her to fall asleep at night and that she usually wakes up after two to three hours. (Tr. 36). However, she also testified that the medicine makes her so tired that she sometimes falls asleep when she sits down. (Tr. 43).

Plaintiff testified that because of her leg, back, and hip pain she walks to her mailbox only a few times each week. She also claimed to have difficulty ascending and descending the staircase in her home. (Tr. 37). Plaintiff stated that she rarely cooks, does not vacuum, cannot do yard work, does not grocery shop, and cannot bring the laundry up or down the stairs. (Tr. 38-39). She explained that she has a housekeeper who helps clean and do laundry. (Tr. 38). Plaintiff testified that she is unable to lift items weighing more than 10 pounds. (Tr. 39). She stated that she can stand for about 10 minutes at one time and sit for about 30 minutes at one time. (Tr. 39-40).

---

[2] Gabapentin is used to help control seizures, to relieve the pain of postherpetic neuralgia, and restless leg syndrome. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694007.html (last visited on Oct. 21, 2013).

[3] Skelaxin is indicated as an adjunct to rest, physical therapy and other measures for the relief of discomfort associated with acute musculoskeletal conditions. See Phys. Desk Ref. 1685 (60th ed. 2006).

[4] Vicodin is a narcotic analgesic indicated for relief of moderate to moderately severe pain. Dependence or tolerance may occur. See Phys. Desk. Ref. 530-31 (60th ed. 2006).

[5] Savella is the brand name for milnacipran, a selective serotonin and norepinephrine re-uptake inhibitor indicated for the management of fibromyalgia. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a609016.html (last visited on Oct. 21, 2013).

Gerald D. Belchick, Ph.D., a vocational expert, provided testimony regarding plaintiff's past work and current employment opportunities. (Tr. 46-50, 108). Dr. Belchick classified plaintiff's previous office manager position as a skilled occupation, requiring light work, with a Specific Vocational Preparation (SVP) level of 7.[6] The ALJ asked Dr. Belchick whether the office manager position still existed in significant numbers. Dr. Belchick answered in the affirmative and stated that in the St. Louis area there would be three or four thousand such jobs, with forty-eight times that number in the national economy. (Tr. 48).

The ALJ asked Dr. Belchick whether a 58-year old individual with plaintiff's educational background would be able to return to work as an office manager with the following limitations: ability to lift and carry 20 pounds occasionally and 10 pounds frequently; ability to sit, stand, and walk for about 6 hours in an 8-hour work day with normal breaks; occasional bending, stooping, kneeling, crouching, and crawling; inability to climb ladders, ropes, or scaffolding; limited ability to climb ramps and stairs; and no tolerance to violent vibrations or cold temperatures. Dr. Belchick stated that an individual with those limitations would be able to return to work as an office manager. Dr. Belchick explained that the office manager position requires frequent reaching, handling, and fingering, which were not listed as limitations, and that the only restriction to the job would be stooping at the occasional level. (Tr. 47-48).

The ALJ then asked Dr. Belchick whether an individual who is unable to work 15 to 20 days a month because of severe pain would be able to maintain employment. Dr.

---

[6] The SVP level listed for each occupation in the Dictionary of Occupational Titles (DOT) connotes the time needed to learn the techniques, acquire the information, and develop the facility needed for average work performance. Hulsey v. Astrue, 622 F.3d 917, 923 (8th Cir. 2010). At SVP level 7, the occupation requires over 2 years and up to and including 4 years. 20 C.F.R. § 656.3.

Belchick answered in the negative and stated that if an individual missed one day per month for unskilled work, the national average reflects that the individual would be terminated.

### C. Medical Evidence

The medical record reflects that plaintiff saw her dentist, Thomas Delaney, D.D.S., on multiple occasions between January 7, 2000 and January 12, 2010 with complaints of jaw pain and swelling. (Tr. 311-314). The medical record also reflects that plaintiff saw Martin Willman, M.D. of the Midwest Ears, Nose, and Throat Center on August 2, 2006, November 8, 2007, November 26, 2007, February 29, 2008, March 7, 2008, April 20, 2009, and May 1, 2009. (Tr. 211-216). The notes from these visits are illegible.

On May 9, 2007, plaintiff saw Kevin Weikart, M.D. for medication refills and a request for Ambien.[7] (Tr. 287). Dr. Weikart wrote that plaintiff suffered from insomnia, depression, and panic attacks. Dr. Weikart counseled plaintiff on diet and exercise for obesity reduction. On August 24, 2007, plaintiff saw Dr. Weikart for a medication follow up and was prescribed Zoloft[8] and Xanax.[9] (Tr. 286). On September 24, 2007, Dr. Weikart included hypertension and degenerative joint disease as additional diagnoses. (Tr. 285). On October 24, 2007, plaintiff saw Dr. Weikart with complaints of a sore

---

[7] Ambien is used for the short-term treatment of insomnia. See Phys. Desk Ref. 2867-68 (60th ed. 2006).

[8] Zoloft, or Sertraline, is a member of the SSRA class and is used to treat depression, obsessive-compulsive disorder, panic attacks, posttraumatic stress disorder, and social anxiety disorder. It is also used to relieve the symptoms of premenstrual dysphoric disorder. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Oct. 27, 2009).

[9] Xanax is indicated for the treatment of panic disorder. See Phys. Desk Ref. 2655-56 (60th ed. 2006).

throat and headache. On November 21, 2007, plaintiff saw Dr. Weikart for ear and jaw pain. (Tr. 283). On January 1, 2008 and February 20, 2008, plaintiff again saw Dr. Weikart; however, these notes are mostly illegible. (Tr. 281-282).

On January 30, 2008, plaintiff saw Marc Rosenthal, D.M.D., M.D. for a mandible infection that developed several days after her dentist extracted a tooth. (Tr. 203, 311). Dr. Rosenthal placed a drain in the infected area. The following day, Dr. Rosenthal wrote that plaintiff was swollen but feeling better. Plaintiff was prescribed Flagyl[10] and an unidentified medication for pain. On February 1, 2008, Dr. Rosenthal wrote that plaintiff continued to have significant swelling, but did not have any problems with swallowing or breathing. Plaintiff was prescribed Cleocin,[11] Flagyl, and Percocet.[12] On February 4, 2008, plaintiff reported decreased pain with some nausea and dizziness. Dr. Rosenthal believed she was dehydrated and gave her a saline IV. On February 8, 2008, Dr. Rosenthal removed the drain and wrote that plaintiff was continuing to improve. On February 15, 2008, plaintiff reported some discomfort and swelling. Dr. Rosenthal refilled her pain medication. (Tr. 203). On February 19, 2008, Dr. Delaney performed a root canal. On February 22, 2008, plaintiff saw Dr. Rosenthal for complaints of pain and an examination revealed no infection in the area where the root canal was performed. (Tr. 204).

---

[10] Metronidazole, or Flagyl, eliminates bacteria and other microorganisms that cause infections of the reproductive system, gastrointestinal tract, skin, vagina, and other areas of the body. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a689011.html (last visited Oct. 29, 2013).

[11] Clindamycin, or Cleocin, is used to treat certain types of bacterial infections. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682399.html (last visited Oct. 29, 2013).

[12] Percocet is a combination of Oxycodone and Acetaminophen. Ocycodone is an opioid analgesic indicated for relief of moderate to moderately severe pain. It can produce drug dependence. See Phys. Desk. Ref. 1114 (60th ed. 2006).

On March 12, 2008, Dr. Weikart formally diagnosed plaintiff with right lower jaw osteomyelitis. (Tr. 279). On March 19, 2008, Dr. Weikart ordered the placement of a peripheral IV and the intravenous administration of Rocephin,[13] in order to treat plaintiff's osteomyelitis. (Tr. 235-239). On April 3, 2008, Dr. Rosenthal wrote that plaintiff was improving and that she was receiving the IV treatment every day. On April 25, 2008, Dr. Rosenthal again wrote that plaintiff was improving. On May 9, 2008, plaintiff reported discharge and tenderness. Dr. Rosenthal warned that additional teeth might need to be extracted. On June 6, 2008 and June 23, 2008, plaintiff complained of swelling and tenderness. Dr. Rosenthal found no infection, but wrote that plaintiff was suffering from continued bone loss and that further extraction was necessary. (Tr. 204). On July 25, 2008, Dr. Rosenthal saw plaintiff and wrote that it appeared that the bone loss was the same or worse. (Tr. 205).

On September 3, 2008, Dr. Weikart sent Dr. Rosenthal a letter expressing his concern regarding plaintiff's infected teeth. Dr. Weikart informed Dr. Rosenthal that plaintiff's dentist gave her a bacterial mouth wash and began her on a TMJ protocol. Dr. Weikart stated that he also referred her to Brian Smith, M.D. (Tr. 207). The record does not contain any reports from Dr. Smith.

On September 16, 2008, plaintiff underwent an ultrasound guided insertion of a single-lumen PICC line at St. Joseph's Hospital West to receive long term antibiotics. (Tr. 227-231). On September 17, 2008, plaintiff returned to St. Joseph's Hospital for an IV infusion. (Tr. 225-226). From September 15, 2008 to April 10, 2009, plaintiff continued to complain about jaw pain to Dr. Weikart. (Tr. 266-274).

---

[13] Ceftriaxone Injection, or Rocephin, is used to treat certain infections caused by bacteria. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a685032.html (last visited Oct. 29, 2013).

On April 27, 2009, plaintiff underwent a CT scan of her neck due to complaints of swelling. (Tr. 217-218, 339). Dr. Willman read the results and found that the area of palpability corresponded to a normal appearing parotid gland with normal sized lymph nodes. On June 10, 2009, plaintiff saw James H. Hinrichs, M.D. for complaints of persistent jaw pain and adenopathy. (Tr. 256-258). Plaintiff was prescribed Clindamycin and Doxycycline,[14] but both medications caused rashes. Dr. Hinrichs wrote that it was likely plaintiff had a residual infection from the osteomyelitis. On July 30, 2009, plaintiff returned to Dr. Hinrichs for complaints of ongoing jaw pain and right preauricular adenopathy. Dr. Hinrichs noted a possible need for an MRI. (Tr. 336).

On September 1, 2009, plaintiff was admitted to St. Joseph's Hospital West for complaints of swelling below her right ear. (Tr. 223-224, 340). A nuclear medicine white blood cell scan was performed. The results found no abnormal uptake in the head, neck, or upper chest region, mild physiologic bone marrow, and partially visible liver uptake. The treatments notes stated that the there was "no explanation for patient's symptoms."

On September 16, 2009, plaintiff saw Dr. Hinrichs for a follow up of right jaw pain and tender lymphadenopathy in right anterior cervical. (Tr. 247-255, 335-336). The treatment notes state that plaintiff improved since the last visit despite maintaining right-sided mandibular pain and intermittent lymph node enlargement. Dr. Hinrichs noted a possibility that plaintiff suffered from fibromyalgia and chronic depression. On October 19, 2009, Dr. Hinrichs wrote that plaintiff slightly improved since her last visit and that she was stable on her current therapy. (Tr. 334-335). On

---

[14] Doxycycline is used to treat certain types of bacterial infections. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682063.html (last visited Oct. 29, 2013).

October 21, 2009, plaintiff saw Dr. Weikart with complaints of full body pain. Dr. Weikart wrote that plaintiff had 18/18 tender points. (Tr. 263). On November 16, 2009, Dr. Weikart included fibromyalgia as a diagnosis in his treatment notes and prescribed Savella, a medication used to treat fibromyalgia. (Tr. 262).

On March 1, 2010, plaintiff saw Sandra L. Tate, M.D. for an independent medical examination. (Tr. 319-320). Dr. Tate provided a report which she based on a functional questionnaire and an examination. Dr. Tate wrote that plaintiff reported that she last worked in 2002 but quit so that she could travel with her husband. Plaintiff further reported that she suffered from an aching discomfort in her jaw, frontal headaches, occasional nausea, and pain in both elbows, knees, and ankles. Dr. Tate wrote that plaintiff was remarkable for headaches, dizziness, numbness, memory loss, insomnia, nervousness, joint pain, muscle weakness, back pain, hearing loss, ringing in ears, weight gain, and fatigue. (Tr. 321-322).

Dr. Tate described plaintiff as a well-developed, well-nourished female in no acute distress, who was alert and oriented with an appropriate mood and affect. An examination of the cervical spine revealed bilateral upper trapezius tension and tenderness with intact range of motion except for side bending, which was "30% of normal." A musculoskeletal examination of plaintiff's upper extremities revealed no tenderness and a normal range of motion. An examination of plaintiff's lumbosacral spine revealed no tenderness and normal range of motion, except that flexion was 80 degrees. A musculoskeletal examination of plaintiff's lower extremities revealed significant hamstring and piriformis muscle tightness, full range of motion of the hip, knee, and ankle, except for hip abduction which was 30 degrees bilaterally, no atrophy, 5/5 muscle strength, and no tenderness or instability. Dr. Tate described plaintiff's gait

as slow, but within normal limits, and stated that plaintiff was able to ambulate without deficit. Dr. Tate found plaintiff's only limitation to be "lifting greater than 50 pounds on a frequent bending at the waist [sic]." (Tr. 322).

On March 23, 2010, Aine Kresheck performed a psychiatric review and provided her opinion on a pre-printed form. (Tr. 323-333). Ms. Kresheck checked off that plaintiff suffered from non-severe affective and anxiety-related disorders, which Ms. Kresheck identified as depression and anxiety. Ms. Kresheck found that plaintiff possessed mild restrictions in activities of daily living; mild difficulties in maintaining concentration, persistence, or pace; no difficulties in maintaining social functioning; and had no repeated episodes of decompensation. (Tr. 331).

David Meyer, a non-examining consultant,[15] completed a Physical Residual Functioning Capacity Assessment (PRFCA) on March 24, 2010. Mr. Meyer based his conclusions on an interview with plaintiff and plaintiff's medical records. (Tr. 59-64, 179). Mr. Meyer concluded that plaintiff could occasionally lift or carry 20 pounds; frequently lift or carry 10 pounds; stand or walk with normal breaks for about 6 hours in an 8-hour workday; push or pull without limitation; climb, balance, stoop, kneel, crouch, or crawl without limitation; and reach, handle, finger, feel, see, hear, or speak without limitation. Mr. Meyer also concluded that plaintiff did not have any environmental limitations.

---

[15]Mr. Meyer is identified in the form as a Single Decisionmaker (SDM). Missouri is one of 20 states in which nonmedical disability examiners are authorized to make certain initial determinations without requiring a medical or psychological consultant's signature. See Office of the Inspector General, Audit Report Single Decisionmaker Model – Authority to Make Certain Disability Determinations without a Medical Consultant's Signature (Aug. 2013).

### D. Additional Records Before the Appeals Council

After the ALJ rendered his adverse decision, plaintiff submitted additional medical records to the Appeals Council. (Tr. 341-406). The Appeals Council concluded that the additional information did not provide a basis for changing the ALJ's decision, and denied plaintiff's request for review. (Tr. 1-2).

The additional records submitted to the Appeals Council included an October 5, 2011 visit with Dr. Weikart in which he wrote that plaintiff had 16/18 tender points and that plaintiff suffered from chronic pain and discomfort, fibromyalgia pain, and muscle pain and spasm. (Tr. 346). On October 12, 2011 to October 18, 2011, plaintiff was admitted into St. Joseph's Hospital West due to a sudden onset of severe right flank pain . (Tr. 357-362, 367-399). Although this incident was attributed to possible neuropathic intercostal pain, the discharge summary did note that plaintiff had a "history of fibromyalgia." (Tr. 362-364).

On October 21, 2011, plaintiff saw Dr. Weikart with complaints of continued pain. Plaintiff was provided with a Percocet refill. (Tr. 348-349). On October 26, 2011, plaintiff saw Dr. Weikart and reported less pain. Dr. Weikart instructed her to cut her Percocet prescription in half. (Tr. 350). On November 28, 2011, plaintiff saw Dr. Weikart for a one month follow up. (Tr. 351). Dr. Weikart wrote that plaintiff had discontinued taking Percocet, but continued to take Vicodin. Dr. Weikart ordered an MRI of the spine. On March 28, 2012, Plaintiff saw Dr. Weikart who recommended a nerve ablation procedure. (Tr. 353).

### III. The ALJ's Decision

In the decision issued on August 25, 2011, the ALJ made the following findings:

1. Plaintiff is the unmarried widow of the deceased insured worker and has attained the age of 50. Plaintiff meets the non-disability requirements for

> disabled widow's benefits set forth in section 202(e) of the Social Security Act.
>
> 2. The prescribed period ends on November 30, 2012.
>
> 3. Plaintiff has not engaged in substantial gainful activity since February 1, 2008, the alleged onset date.
>
> 4. Plaintiff has the following medically determinable impairments: osteomyelitis of the jaw following a tooth extraction.
>
> 5. Plaintiff does not have an impairment or combination of impairments that has significantly limited (or is expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months; therefore, plaintiff does not have a severe impairment or combination of impairments.
>
> 6. Plaintiff has not been under a disability, as defined in the Social Security Act, from February 1, 2008, through the date of this decision.

(Tr. 9-15).

## IV. Legal Standards

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." Lacroix v. Barnhart, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. Id.

"Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own

description of his limitations." Moore, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. Moore, 572 F.3d at 523; accord Dukes v.

Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V. Discussion

Plaintiff contends that the ALJ erred by failing to consider fibromyalgia as a medically determinable impairment and by improperly evaluating plaintiff's credibility. (Doc. #13).

### A. Fibromyalgia

In making the determination that plaintiff's fibromyalgia was not a medically determinable impairment, the ALJ wrote:

> [T]here is nothing in the record to indicate a definitive diagnosis of fibromyalgia, no laboratory work ruling out other possible causes for her alleged joint pain and there is no examination in which eleven of the eighteen trigger points were detected as specified in the current diagnostic criteria. Furthermore, Dr. Tate did not find the claimant to have the requisite trigger points on her evaluation and made no diagnosis of fibromyalgia. Dr. Tate reported that the claimant was capable of lifting up to fifty pounds with no frequent bending at the waist, but was otherwise unlimited.

(Tr. 14).

The Court finds that substantial evidence on the record does not support the ALJ's opinion as it relates to plaintiff's fibromyalgia and that the ALJ did not evaluate

the record as a whole. The ALJ failed to include any reference to the opinion of plaintiff's treating physician, Dr. Weikart. See Thompson v. Sullivan, 957 F.2d 611, 614 (8th Cir. 1992) (Evidence from a treating physician is generally accorded great weight and deference over consulting physicians).

Treatment notes written by Dr. Weikart reflect that plaintiff did, in fact, possess the requisite number of tender spots. "[T]o be diagnosed with fibromyalgia, a patient must have at least 11 out of 18 tender spots." Phelps v. Astrue, 4:11-CV-1362 (E.D.Mo. July 13, 2012) (citing The Merck Manual 1370 (16th ed. 1992)). On October 21, 2009, plaintiff complained of full body pain and an inability to sleep three times per week. During this visit, Dr. Weikart wrote that plaintiff had "18/18 tender points." (Tr. 263). On November 16, 2009, Dr. Weikart included fibromyalgia as a diagnosis in his treatment notes. (Tr. 262). In further support of Dr. Weikart's medical opinion, Dr. Hinrichs, in his September 16, 2009 treatments notes, independently considered the possibility that plaintiff suffered from fibromyalgia. (Tr. 248). The record also reflects that plaintiff was prescribed Savella, which is a drug used for treating fibromyalgia pain. (Tr. 163, 198, 263).

Although the ALJ supported his opinion with medical evidence from Dr. Tate, who found no tender points during her evaluation of plaintiff, the ALJ did not explain why the opinion of Dr. Tate, a one-time consultative examiner, was given more weight than Dr. Weikart, a treating physician. "When an ALJ discounts a treating physician's opinion, he should give good reasons for doing so." Martise v. Astrue, 641 F.3d 909, 925 (8th Cir. 2011); 20 C.F.R. § 404.1527(d)(2).

Moreover, the new evidence submitted to the Appeals Council further supports the ALJ's error in finding that plaintiff's fibromyalgia was not a medically determinable

impairment. On October 18, 2011 Dr. Weikart wrote that plaintiff had a "history of fibromyalgia." (Tr. 360, 364). On October 5, 2011, October 21, 2011 and November 28, 2011, Dr. Weikart wrote that plaintiff was suffering from "fibromyalgia pain." (Tr. 346, 348, 351). "[W]hen the Appeals Council 'has considered new and material evidence and declined review, [the Court] must decide whether the ALJ's decision is supported by substantial evidence in the whole record, including the new evidence." Crawford v. Astrue, 1:10-CV-166 (E.D.Mo. Feb. 2, 2012) (quoting Gartman v. Apfel, 220 F.3d 918, 922 (8th Cir. 2000)).

The Court concludes that the ALJ's decision that plaintiff's fibromyalgia was not a medically determinable impairment is not supported by substantial evidence. "The ALJ's silence regarding the weight given to Dr. [Weikart's] opinion, coupled with other errors in the written decision, creates uncertainty and casts doubt upon the ALJ's rationale for denying plaintiff's claims. This uncertainty can be clarified on remand." Willcockson v. Astrue, 540 F.3d 878, 880 (8th Cir. 2008). Thus, this case must be reversed and remanded for a new consideration of the full record.

### B. Plaintiff's Credibility

In light of the above, the Court cannot conclude that the ALJ considered all of the evidence relevant to plaintiff's complaints. In discounting plaintiff's credibility, the ALJ failed to include Dr. Weikart's opinions, which could have supported her allegations of disabling pain. Upon remand, the ALJ shall reassess his credibility determination.

### VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is not supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and this matter is **remanded** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings.

A separate judgment in accordance with this Memorandum and Order will be entered.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 29th day of January, 2014.